**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Michael Wagner,

               Plaintiff,

v.

ABW Legacy Corp, Inc., et al,

               Defendants.

No. CV-13-2245-PHX-JZB

**ORDER**

     Pending before the Court are Defendant's Motion to Exclude Plaintiff's Expert Brian H. Kleiner (Doc. 73), Defendant's Motion to Exclude Plaintiff's Expert Colin Haddock (Doc. 74), Plaintiff's Motion to Strike (Doc. 88), and Defendant's Motion for Summary Judgment (Doc. 71).  For the reasons below, the Court will grant Defendant's Motion to Exclude Dr. Kleiner's testimony, grant in part and deny in part Defendant's Motion to Exclude Mr. Haddock's testimony, deny Plaintiff's Motion to Strike, and deny Defendant's Motion for Summary Judgment.[1]

**I.    Background**

     **a.  Plaintiff's Employment With Defendant**

---

[1] At least one party has requested oral argument on each of Defendant's pending Motions.  However, because the parties submitted memoranda discussing the law and evidence in support of their positions and oral argument would not have aided the Court's decisional process, the Court did not hold oral argument on Defendant's Motion for Summary Judgment. *See Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *Lake at Las Vegas Investors Group, Inc. v. Pacific. Dev. Malibu Corp.*, 933 F.2d 724, 729 (9th Cir. 1991). The Court likewise finds that it has "an adequate record before it to make its ruling" without holding a *Daubert* evidentiary hearing.  *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1138–39 (9th Cir. 2002).

Defendant provides collision repairs to the public.  (Doc. 72 ¶ 1.)  Plaintiff began working for Defendant as a mechanic in February 2007.  (*Id.* ¶ 31.)  During Plaintiff's employment, Defendant paid him a flag rate per assigned flag hour, with a set number of assigned flag hours per job.  (*Id.* ¶¶ 33, 36-37.)  The insurance companies set the amounts they would pay Defendant for repairs on vehicles that had been in collisions.  (*Id.* ¶ 36.)  The amount Plaintiff earned would increase the faster and more efficiently he completed jobs as compared to the insurance companies' guidelines.  (*Id.*)  Payment was made to Plaintiff upon the completion of the job and delivery of the repaired vehicle.  Therefore, payment could be paid in a different pay period than the one in which Plaintiff performed the work, and Plaintiff's pay fluctuated from week to week.  (*Id.* ¶ 19.)

When he began his employment, Plaintiff received a flag rate of $21 per flag hour.  (*Id.* ¶¶ 31, 33.)  In July 2010, Defendant raised Plaintiff's flag rate to $23 per flag hour for mechanical work.  (*Id.* ¶ 39.)   Around that time, Plaintiff also began to perform body technician work in addition to mechanic work, for which he was paid a $17.50 flag rate.  (*Id.*)  It is undisputed that the chart Bates numbered ABW 1214, and found at Doc. 72-7 at 83, contains Plaintiff's total hours worked per week as reflected in Defendant's time clock records, and Plaintiff's gross earnings per pay period (bi-weekly in 2010 and weekly in 2011) as reflected in Defendant's payroll records, for the period of June 2010 through October 2011.  (*Id.* ¶ 30; Doc. 83 at 7.)  It is also undisputed that in 2011, the Arizona minimum wage was $7.35 and, therefore, $11.025 is 1.5 times the state minimum wage in effect at that time.  (Doc. 72 ¶ 27; Doc. 83 at 7.)

On August 18, 2011, Plaintiff suffered an injury while at work.  (Doc. 72 ¶ 43.)  Plaintiff spoke with a representative from Defendant's worker's compensation carrier shortly after his injury, and subsequently received worker's compensation benefits.  (*Id.* ¶ 44.)  Plaintiff's employment with Defendant ended on July 25, 2012.  (*Id.* ¶¶ 105-06.)  The parties dispute the circumstances surrounding and reasons for the end of Plaintiff's employment.  (Docs. 72, 83.)  Plaintiff asserts Defendant terminated his employment in retaliation for filing a worker's compensation claim, in violation of the Arizona

Employment Protection Act (AEPA), A.R.S. § 23-1501(3)(c)(iii). (Doc. 82 at 2-3.) Defendant asserts that it did not terminate Plaintiff's employment; rather, Plaintiff abandoned his position by failing to communicate his intent to return to work. (Doc. 71 at 4-8.) Plaintiff further asserts claims against Defendant for failure to pay Plaintiff the required minimum wage pursuant to the Arizona Minimum Wage Act (AMWA), A.R.S. § 23-363, and failure to pay Plaintiff overtime pursuant to the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 206, 207. (Doc. 82 at 12.) Defendant asserts that Plaintiff was exempt under the FLSA, and Defendant paid Plaintiff all wages owed to him. (Doc. 71 at 10-17.)

### b. Dr. Kleiner's Report

On January 26, 2015, Dr. Kleiner, a human resources expert disclosed by Plaintiff, issued his Report. (Doc. 73-1 at 60-72.) Dr. Kleiner asserts that he relied on the following data in forming the opinions in his Report: (1) transcripts of the depositions of Plaintiff, Nelly Diaz, Sean Emile St. Cyr, and Christopher Parker; (2) notes created by Plaintiff's attorney, including a legal analysis, witnesses, a chronology, documentation regarding attempts to communicate with Plaintiff by Defendant, and "Documented Ulterior Motives for Termination"; (3) numerous exhibits to Ms. Diaz's deposition; (4) a Technical Assistance Manual of the Employment Provisions (Title 1) of the Americans with Disabilities Act, by the EEOC, from January 1992; and (5) a 2010 publication titled "Helping Injured Employees Return to Work." (*Id.* at 65-66.)

Dr. Kleiner opines that "[t]he 'return to work' practices followed by [Defendant] in relation to [Plaintiff] were not consistent with the standard of care of appropriate human resource management practice" in the following three ways: (1) Defendant "did not adequately develop and formalize their policies and procedures concerning their return-to-work process and train their personnel, especially [Plaintiff], on them"; (2) "[a]s a result, their interactive process with [Plaintiff] was inadequate; and they never selected and made an offer of reasonable accommodation to him that was consistent with his limitations"; and (3) Defendant "terminated [Plaintiff's employment] without adequate

justification after he properly complied with their latest request of him to call them back if he was interested in continuing his employment with them." (*Id.* at 71-72.)

Dr. Kleiner states in his Report that the applicable "standard of care"[2] relevant to his analysis is provided by the Equal Employment Opportunity Commission (EEOC) and consists of the following steps:

1. "Look at the particular job involved" and "[d]etermine its purpose and its essential functions."

2. "Consult with the individual with a disability to find out his or her specific physical or mental abilities and limitations as they relate to the essential job function.  Identify the barriers to job performance and assess how these barriers could be overcome with an accommodation."

3. "In consultation with the individual, identify potential accommodations and assess how effective each would be in enabling the individual to perform essential job functions."

4. "If there are several effective accommodations that would provide an equal employment opportunity, consider the preference of the individual with a disability and select the accommodation that best serves the need of the individual and the employer."

(*Id.* at 66-67.)[3]

In support of his opinions, Dr. Kleiner cites to the EEOC standard of care as detailed above, and to his summary of selected portions of testimony by Plaintiff, Mr. St. Cyr, and Ms. Diaz during their depositions.  (*Id.* at 67-71.)  Outside of this summary, Dr. Kleiner provides no analysis regarding his opinions or any discussion of his methodology in reaching them.

### c.  Mr. Haddock's Reports

Plaintiff also retained a damages expert, Mr. Haddock, to do the following:  (1) to determine Plaintiff's "effective regular hourly rate of pay" and compare that rate to the

---

[2] Dr. Kleiner acknowledged during his deposition that the "standard of care" he identified is not a legal standard.  (*Id.* at 22.)  Rather, it reflects what he believes are "excellent practices in this area."  (*Id.* at 17-18.)

[3] Dr. Kleiner also states in his Report that "The Institute for Research on Labor and Employment at the University of California at Berkeley has developed an expanded version of the [the EEOC standard of care], substantial parts of which may be found in Exhibit B."  (*Id.* at 67.)  However, he does not identify or discuss any specific portion of that publication.

Arizona minimum wage per hour then in effect, and to calculate any shortfall; (2) to determine whether Plaintiff was paid 1.5 times his regular pay for overtime hours worked per week, and the amount of any overtime owed; and (3) to project Plaintiff's earnings if he had continued to work for Defendant after his injury, and to calculate the amount of Plaintiff's economic loss resulting from the termination of Plaintiff's employment. (Doc. 79-1 at 3.)

On December 31, 2014, Mr. Haddock issued a Report regarding his analysis and findings.  (*Id.* at 3-39.)  In conducting his analysis, Mr. Haddock relied on the following data:  (1) a summary of gross pay and hours worked; (2) copies of pay stubs for each pay period; (3) time records covering the period from June 25, 2010 to August 18, 2011; (4) Flag Pay Reports covering most, but not all, of the pay periods from July 30, 2010 to January 23, 2011; (5) copies of offer letters from Defendant to Plaintiff after his injury; (6) Reports regarding worker's compensation insurance payments; and (7) documents from O'Reilly's Automotive Stores, Inc., including pay stubs and an IRS W-2 form reporting wages paid to Plaintiff.  (*Id.* at 4.)

In his Report, Mr. Haddock described the calculations he conducted regarding the minimum wage and overtime wages owed to Plaintiff, as well as Plaintiff's projected wages loss had he returned to work for Defendant on May 29, 2012, and Plaintiff's economic loss resulting from his termination of employment.  (*Id.* at 4-12.)  To calculate Plaintiff's "effective hourly rate of pay," Mr. Haddock, relying on data provided by Defendant, divided the gross pay in each period by the number of regular hours worked, plus the number of overtime hours worked multiplied by 1.5.  He then compared the effective hourly rates earned during each pay period with the Arizona minimum wage then in effect.  (*Id.* at 7.)  To determine the amount of overtime wages owed, Mr. Haddock calculated an average of the two flag rates Plaintiff was paid for mechanic and body repair work per flag hour (not hour worked), weighted the average to reflect the number of hours worked in each category of work, and where Plaintiff worked in excess of 40 hours a week, he calculated the overtime premium as 50% of the weighted average

rate of pay.  (*Id.* at 9.)  To calculate Plaintiff's projected earning loss and post-termination economic loss, Mr. Haddock calculated the lost wages based on the flag rate stated in Defendant's May 22, 2012 letter, assumed Plaintiff would work 45 hours per week, and subtracted other earnings Plaintiff received from O'Reilly's Automotive Stores, Inc., as well as some cash earnings Plaintiff identified.  (*Id.* at 9-12.)

Importantly, after comparing the flag hours assigned to Plaintiff's work with Plaintiff's actual hours worked, Mr. Haddock concluded that Plaintiff "frequently performed more efficiently than the standards."  (*Id.* at 7.)  In support of this conclusion, Mr. Haddock calculated that "in the period June 2010 to August 2011, [Plaintiff] completed work in 237 hours less than the standards."  (*Id.*)

Ultimately, based on this analysis, Mr. Haddock concluded the following:

1. Wagner was not paid at least the Arizona minimum wage for 3 pay periods. The shortfall in wages was $ 288.81.

2. Wagner appears not to have been paid for at least 67 hours worked. At his weighted average pay rate, he should have be[e]n paid $1,343.01 for these hours.

3. Wagner was not paid 1.5 times his normal pay for overtime hours, and the shortfall is $4,044.87.

4. Wagner arrived for work on May 29, 2012 as instructed, yet he was sent home, and continued to receive worker's compensation payments, which were lower than the amount he would have earned from working at ABW.  The difference was $1374.66 based on the May 22, 2012 return to work letter (Bates# ABW 0097), or $979.79 based on the weighted average pay rate.

5. Wagner suffered economic loss in the period following his termination. Four calculations of his loss up to November 30, 2014 have been made, as follows:

   • Based on the May 22, 2012 return to work letter, $127,688.15

   • Based on the May 22, 2012 return to work letter, plus raises, $130,853.01

   • Based on his weighted average hourly rate $109,636.91

   • Based on the weighted average hourly rate, plus raises, $111,944.66.

   I have been asked to opine on which of the four calculations in paragraph 5 above that I consider the most appropriate. I believe that it is reasonable to assume that he would have received a pay raise at

sometime during the period since May 2012, and that the COLA rates used are conservative estimates of future pay increases.

The return to work letter (Document Bates# ABW 0097) quite specifically stated he would work as a mechanic, and that ABW would respect the restrictions outlined by Wagner's physician. The letter stated Wagner's "rate of pay would be $23 per flag hour (flag rate)". There was no mention of body technician work, nor of a lower flag rate for such work. Rather than speculate on what work ABW might subsequently assign to Wagner, nor on whether different flag rates might apply, I consider that it is appropriate to calculate based on ABW's written offer.

Accordingly, I consider that calculation 8.2, showing Wagner's post-termination economic loss as $130,853.01, is the most appropriate.

6. The calculations in conclusions 1 through 5 do not include the value of lost employee benefits. Wagner's economic loss calculations do not reflect the losses incurred as a result of the loss of benefits. When such information is available, the calculations should be adjusted to reflect benefits.

(*Id.* at 12-13.)

On March 24, 2015, Mr. Haddock issued a Supplemental Report. (Doc. 79-2 at 2-15.) Based on additional information he received from Defendant in its Fifth Supplemental Disclosure Statement, Mr. Haddock stated that he is "satisfied that" Plaintiff is not owed additional wages for the 67 hours referenced his initial Report, testifying that he "actually got the hours recorded in the wrong column" in a few cases. (*Id.* at 2-3; Doc. 74-1 at 30.) Mr. Haddock did not change any other conclusions from his initial Report. (Doc. 79-2 at 3-15.) However, he provided additional Schedules of calculations regarding wage loss, reflecting the amount with and without overtime. (*Id.* at 5-15.)

## II.    Defendant's Motions to Exclude

Defendant moves to exclude the testimony of both Dr. Kleiner and Mr. Haddock on the basis that their opinions are inadmissible under Rules 702 and 403 of the Federal Rules of Evidence. (Docs. 73, 74.) Plaintiff contends that both experts meet the qualification, reliability, and relevance requirements of Rule 702, and their testimony is not unduly prejudicial. Below, the Court addresses Defendant's Motions to Exclude.

### a. Rule 702 of the Federal Rules of Evidence

Rule 702 of the Federal Rules of Evidence provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, the trial court acts as a gatekeeper and ensures that the proffered scientific testimony meets certain standards of both relevance and reliability before it is admitted. *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert I*"), 509 U.S. 579, 590, (1993). The party proffering expert testimony has the burden of showing the admissibility of the testimony by a preponderance of the evidence. *Daubert I*, 509 U.S. at 592 n.10. "[J]udges are entitled to broad discretion when discharging their gatekeeping function" related to the admission of expert testimony. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-53 (1999)). The Court considers four factors to determine if expert testimony will assist the trier of fact: "(i) whether the expert is qualified; (ii) whether the subject matter of the testimony is proper for the jury's consideration; (iii) whether the testimony conforms to a generally accepted explanatory theory; and (iv) whether the probative value of the testimony outweighs its prejudicial effect." *Scott v. Ross*, 140 F.3d 1275, 1285-86 (9th Cir. 1998).

### i. Qualifications

As an initial matter, the trial court must determine whether the proffered witness is qualified as an expert by "knowledge, skill, experience, training or education." Fed. R. Evid. 702. Because the Rule "contemplates a *broad conception* of expert qualifications,"

- 8 -

1    only a "*minimal foundation* of knowledge, skill, and experience" is required.  *Hangarter*

2    *v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004) (emphasis

3    in original) (quoting *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994)).

4    A "lack of particularized expertise goes to the weight of [the] testimony, not its

5    admissibility."   *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993) (citing *United*

6    *States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984)); *Daubert v. Merrell Dow Pharm.,*

7    *Inc. ("Daubert II")*, 43 F.3d 1311, 1315 (9th Cir. 1995).

8                                    **ii.  Reliability**

9            The trial court must also ensure that the proffered expert testimony is reliable.

10   Generally, to satisfy Rule 702's reliability requirement, "the party presenting the expert

11   must show that the expert's findings are based on sound science, and this will require

12   some objective, independent validation of the expert's methodology."  *Daubert II*, 43

13   F.3d at 1316.  Toward this end, the Supreme Court in *Daubert I* set forth the following

14   factors for the trial court to consider when assessing the reliability of proffered expert

15   testimony: (1) whether the expert's method, theory, or technique is generally accepted

16   within the relevant scientific community; (2) whether the method, theory, or technique

17   can be (and has been) tested; (3) whether the method, theory, or technique has been

18   subjected to peer review and publication; and (4) the known or potential rate of error of

19   the method, theory, or technique.  *Daubert I*, 509 U.S. at 593-94.

20           An expert opinion is reliable if it is based on proper methods and procedures rather

21   than "subjective belief or unsupported speculation."  *Id.* at 590.  The test for reliability

22   "'is not the correctness of the expert's conclusions but the soundness of his

23   methodology.'" *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007)

24   (quoting *Daubert II*, 43 F.3d at 1318).  Alternative or opposing opinions or tests do not

25   "preclude the admission of the expert's testimony—they go to the *weight*, not the

26   admissibility."  *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998).

27   Furthermore, "'[d]isputes as to the strength of [an expert's] credentials, faults in his use

28   of [a particular] methodology, or lack of textual authority for his opinion, go to the

weight, not the admissibility, of his testimony.'" *Id.* (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

### iii.  Relevance

Finally, the Court must ensure that the proffered expert testimony is relevant.  As articulated in Rule 702, expert testimony is relevant if it assists the trier of fact in understanding evidence or in determining a fact in issue.  *Daubert I*, 509 U.S. at 591. Thus, the party proffering such evidence must demonstrate a valid scientific connection, or "fit," between the evidence and an issue in the case.  *Id.*

Expert testimony is inadmissible if it concerns factual issues within the knowledge and experience of ordinary lay people because it would not assist the trier of fact in analyzing the evidence. In the Ninth Circuit, "[t]he general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony."   *United States v. Gwaltney,* 790 F.2d 1378, 1381 (9th Cir. 1986). Because unreliable and unfairly prejudicial expert witness testimony is not helpful to the trier of fact, the trial court should exclude such evidence.  *Jinro Am. v. Secure Inv., Inc.,* 266 F.3d 993, 1004 (9th Cir. 2001).  Likewise, expert testimony that merely tells the jury what result to reach is inadmissible.  Fed. R. Evid. 704 Advisory Committee Note (1972); *see, e.g.*, *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.").

### b.  Defendant's Motion to Exclude the Testimony of Dr. Kleiner

### i.  Dr. Kleiner's Qualifications

Defendant seeks to exclude Dr. Kleiner's opinions because it asserts he is not qualified to opine about the issues in this case.  (Doc. 73 at 3-4.)  The Court disagrees. Dr. Kleiner has over 30 years of experience related to human resources management. (Doc. 73-1 at 60; Doc. 76-1 at 2-21.)  Defendant argues that Dr. Kleiner does not have specialized experience with worker's compensation issues or the AEPA.  (Doc. 73 at 2.) However, Dr. Kleiner's lack of specialized knowledge does not render him unqualified to

testify as an expert in the area of human resources management.  Rather, any such lack of knowledge goes to the weight of his testimony.  *Garcia*, 7 F.3d at 890.

### ii.  Reliability and Relevance

The Court must, however, exclude Dr. Kleiner's testimony because the methodology he employed is unreliable and he seeks to testify to matters that are within the understanding of the jury or that are legal conclusions not properly the subject of expert testimony.  As detailed above, Dr. Kleiner opines that Defendant's "return to work" practices used with regard to Plaintiff were not consistent with the "standard of care of appropriate human resource management practice" by: (1) failing to "adequately develop and formalize their policies and procedures concerning their return-to-work process and train their personnel," both in general, and "especially" with regard to Plaintiff; (2) failing to adequately engage in the interactive process and select and make an offer of reasonable accommodation to Plaintiff that was consistent with his limitations; (3) and terminating Plaintiff's employment "without adequate justification."  (Doc. 73-1 at 66, 71-77.)

The Court does not find Dr. Kleiner's methodology in reaching his opinions reliable.  Although Dr. Kleiner's Report identifies documents, testimony, and literature from the EEOC and the University of California at Berkeley he reviewed, and a standard of care regarding the interactive process under the ADA provided by the EEOC, his Report does not include any analysis regarding how he applied the proffered standard of care to this case.  (Doc. 73-1.)  Rather, he merely cited to limited portions of the deposition transcripts he reviewed, without explanation or analysis as to how those excerpts support his conclusions and whether, and to what extent, he considered conflicting testimony among the witnesses regarding the same issues.  (*Id.*)

Based on his Report and testimony, it appears that Dr. Kleiner gave more weight to deposition testimony that supports his conclusions, while failing to consider or at least address and analyze contrary testimony.  Dr. Kleiner testified that he was aware of witness testimony regarding a conversation Plaintiff's supervisor had with Plaintiff

regarding his limitations and potential accommodations available to Plaintiff, and, if that testimony is taken as true, it would be evidence of the interactive process and an offer of a reasonable accommodation.  (*Id.* at 34-36.)  However, Dr. Kleiner failed to address that testimony in any way in applying the standard of care.

Similarly, Dr. Kleiner did not include in his Report reference to or analysis of testimony by Defendant's employees regarding repeated efforts to communicate with Plaintiff that was contrary to his conclusions.  (*Id.* at 41-42, 50.)  Additionally, Dr. Kleiner failed to provide any discussion or analysis of the deposition testimony of the third party adjuster, who Dr. Kleiner acknowledges spoke at length with Plaintiff immediately after Plaintiff was injured.  (*Id.* at 48-50.)  Dr. Kleiner testified that in his opinion, it is appropriate and not contrary to human resources practices for "an employer to delegate the task of training an injured worker on the returning-to-work process to the insurance claims adjustor."  (*Id.* at 50.)  Yet, Dr. Kleiner admittedly did not include a summary or analysis of any testimony by the claims adjustor regarding his communications with Plaintiff after Plaintiff was injured.  (*Id.* at 48-49.)

While the Court does not indicate that such testimony would or should change Dr. Kleiner's opinions, his apparent dismissal of relevant evidence without any analysis is not a reliable methodology in reaching his opinions in this case.  *See In re Rezulin*, 309 F. Supp. 2d 531, 551 (S.D. N.Y. 2004) (holding expert testimony inadmissible where the expert "does no more than counsel for plaintiff will do in argument, i.e., propound a particular interpretation of [defendant]'s conduct") (quotation omitted).

Further, at least some of Dr. Kleiner's conclusions are not even addressed by the standard of care and/or deposition testimony he cites.  Although Dr. Kleiner cites to a standard regarding the interactive process under the ADA, that standard does not address "adequate" reasons for terminating Plaintiff's employment, or "adequately" developing policies and procedures regarding return to work and training on those procedures, particularly outside of Plaintiff.  (Doc. 73-1 at 60-72.)  Nor does Dr. Kleiner include any analysis regarding these issues.  Yet, he included opinions about those topics in his

Report.

Additionally, Dr. Kleiner's review of deposition testimony and his resulting credibility determinations are within the common understanding of the jury and, therefore, Dr. Kleiner's Report and opinions do not appear to offer any expertise to assist the jury in this case.[4]  *See Duncan*, 42 F.3d at 101.   Finally, although Dr. Kleiner couches his opinions as relating to a failure to follow an applicable standard of care, his opinion that Defendant terminated Plaintiff's employment without "adequate justification" is really a legal conclusion regarding the ultimate issue on Plaintiff's AEPA claim—whether Defendant unlawfully terminated Plaintiff's employment.   Such expert testimony is inadmissible.  *See Id.*

Other courts have excluded Dr. Kleiner's testimony in similar circumstances.  *See Brown v. West Corp.*, No. 8:11CV284, 2014 WL 1757576, at *1-2 (D. Neb. May 1, 2014) (granting motion to exclude Dr. Kleiner's opinion that the defendant's treatment of the plaintiff "prior to his resignation was inconsistent with appropriate human resource management practice generally and its own policy" because Dr. Kleiner's Report "offers only a conclusory statement without expressly establishing or applying an industry standard," and the "introduction of the expert report and testimony threaten to place too much emphasis on or lend undue credibility to the interpretation of certain evidence without aiding the jury's understanding of its significance or providing expertise that justifies the interpretation"); *Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 99, 101, 104 (D. Conn. 2006) (excluding Dr. Kleiner's opinion that "the defendants' rationale for downsizing the plaintiff from her position as service advisor is inadequate" because his opinion provides a legal conclusion and "is based on his analysis of facts in the record, including the chronology of relevant events[;]" "[w]ithout more, this is an assessment the jury can make without assistance from an expert.").

Plaintiff is correct that some courts (outside this District) have allowed human

---

[4] Notably, Dr. Kleiner discusses Plaintiff's deposition testimony as if it is all undisputed fact, while characterizing portions of Mr. St. Cyr's and Ms. Diaz's testimony as allegations or contentions.  (*Id.* at 67-70.)

resources experts to testify regarding an employer's deviation from an identified standard of care.  However, even assuming allowing such testimony is appropriate, the cases Plaintiff cites in his Response do not eliminate the requirement that admissible expert testimony be reliable and assist the jury.  For example, in *Wood v. Montana Dep't of Revenue*, No. CV 10-13-H-DMW, 2011 WL 4348301, at *2-3 (D. Mont. Sept. 16, 2011), while the court allowed a human resources expert to testify as to whether the defendant deviated from its own policies and procedures, the court excluded portions of the expert's testimony that concerned matters within the common knowledge of the jury, including whether and to what extent the plaintiff communicated regarding his work absences and performance, and that contained legal conclusions.  Additionally, in *Hernandez v. City of Vancouver*, No. Co4-5539 FDB, 2009 WL 279038, at *4 (W.D. Wash. Feb. 5, 2009), the court excluded portions of a human resources expert's testimony because her "report consists of little more than a recitation of Plaintiff's evidence, combined with her conclusion that the evidence demonstrates that Plaintiff was discriminated against. Allowing this form of testimony would greatly infringe upon the role of the jury."

In this case, as detailed above, Dr. Kleiner followed a methodology whereby he reviewed witness testimony and made credibility determinations favorable to his conclusions.  His conclusory Report, which provides a summary of select portions of the testimony, with no analysis or application of his expertise, does not meet the requirements of Rule 702.  Further, Dr. Kleiner's interpretation of witness testimony is within the common understanding of the jury and contains legal conclusions. Accordingly, the Court will grant Defendant's Motion to Exclude Dr. Kleiner's testimony.

### c.  Defendant's Motion to Exclude the Testimony of Mr. Haddock

Defendant moves to exclude testimony by Mr. Haddock because: (1) he is not qualified to give any opinions in this case; (2) his opinions are based on an inaccurate assumption that Plaintiff is entitled to overtime; (3) he improperly altered source data without disclosing those alterations to Defendant; (4) he made "numerous data entry

1    errors"; (5) he did not use a proper methodology in calculating minimum wage and

2    overtime wages due; (6) his analysis regarding projected earnings ignores important

3    factors; and (7) his opinions are unduly prejudicial pursuant to Rule 403.  (Doc. 74.)  As

4    detailed below, the Court will grant Defendant's Motion in part because although it finds

5    Mr. Haddock qualified to testify regarding damages, his calculations are admittedly based

6    on numerous data entry errors and, therefore, those calculations are not the result of a

7    reliable methodology and will not assist the jury.  However, the Court will allow Mr.

8    Haddock to testify that, in his opinion, the appropriate formula for calculating the amount

9    of any minimum wage shortfalls is the "effective hourly rate of pay" formula he details in

10   his Report (at Doc. 79-1, page 7).

11                              **i.  Mr. Haddock's Qualifications**

12          Defendant argues that Mr. Haddock is not qualified to testify in this case because:

13   (1) he has limited experience with the specific wage and hour issues in this case,

14   including application of exemptions in Section 7(i) of the FLSA; (2) he is not a CPA; (3)

15   he has only "helped advise" a "few clients" and worked with "some small businesses that

16   had a very simple payroll"; (4) his experience with auto body repair industry is limited to

17   being a customer; and (5) he does not have an expertise in U.S. payroll matters, rather,

18   his experience is primarily in management roles for foreign companies, including

19   overseeing "finances, investments, and securities regulatory matters."  (Doc. 74 at 3-5.)

20          In response, Plaintiff contends that Mr. Haddock does not need specialized

21   knowledge of the FLSA or Arizona law because his testimony is only offered to establish

22   damages, should the Court find that Plaintiff is not exempt.   (Doc. 79 at 4.)  Plaintiff

23   further asserts that Mr. Haddock's credentials as a chartered accountant for England &

24   Wales for 38 years and for Ontario, Canada for 35 years are equivalent to a "US-based

25   CPA credential," and his "relevant experience performing audits for Pricewaterhouse

26   Coopers, as well as performing senior management roles as an auditor, CFO and

27   controller for various financial institutions and investment companies[,] . . . [i] addition . .

28   . [to] preparing financial forecasts and projections to business and investment funds[,] . . .

[qualify him] to analy[ze] [Defendant's] records, and perform calculations as set forth in his report." (*Id.* at 5-6.)

Rule 702 does "not require that expert witnesses be academics or PhDs, or that their testimony be 'scientific' (natural scientific or social scientific) in character." *Tuf Racing Products, Inc. v. American Suzuki Motor, Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). Given his accounting and financial business background, the Court finds that Mr. Haddock is qualified to analyze Plaintiff's payroll records and calculate damages in this case. Although Mr. Haddock's experience in the United States is limited, his six years of experience at Pricewaterhouse Coopers, his accounting credentials, and economic degree render him sufficiently qualified to render opinions regarding Defendant's payroll records and to conduct wage calculations based on those records. *See Longlois v. Stratasys*, *Inc.*, 88 F. Supp. 3d 1058, 1064 (D. Minn. 2014) (allowing Accountant to testify regarding the hours that the plaintiffs worked during each week and the overtime owed, even though the expert admittedly did not have an expertise in the FLSA). Importantly, unlike the experts in the cases cited by Defendant, Mr. Haddock does not opine as to whether Plaintiff is exempt under the FLSA. Any limitation in specific expertise regarding the FLSA goes to the weight of Mr. Haddock's testimony. *Garcia*, 7 F.3d at 890.

### ii.  Reliability and Relevance

The Court will exclude all of Mr. Haddock's testimony, other than his opinion regarding the appropriate formula for calculating any minimum wage shortfalls, because Mr. Haddock made numerous data entry errors that, admittedly, impact his calculations.

Mr. Haddock testified during his March 25, 2015 deposition that the values in his Report for the number of hours Plaintiff worked from the period ending on May 22, 2011 through August 21, 2011 are incorrect. (Doc. 74-1 at 37-38.) Mr. Haddock further testified that his calculations of the rate paid to Plaintiff for two of the three weeks where he opined there was a minimum wage shortfall, and the total minimum wage payment owed, would change once he corrected the data and recalculated the amounts. (*Id.* at 39.) Likewise, Mr. Haddock admitted that his overtime calculations were impacted by the

same data entry errors, and his conclusion regarding the overtime owed is not correct. (*Id.* at 46.)

Additionally, Mr. Haddock testified that he made several other data entry errors, which impact his calculations of overtime wages owed and Plaintiff's projected earnings and post-termination economic loss.   (Doc. 74-1 at 68.)   In those calculations, Mr. Haddock assumed that one or both of the flag rates offered to Plaintiff was, or would be, the hourly wage paid to him by Defendant.  (Doc. 79-1 at 7.)  Mr. Haddock testified that he made that assumption because Plaintiff was previously (before his injury) an efficient worker, and Mr. Haddock calculated that Plaintiff completed his work in 237 hours less than the flag hours assigned:

> Q:     Each of the – on HAD 9, each of the calculations – you have 8.1, 8.2, 8.3, 8.4 – they all assume that Mr. Wagner is compensated on an hourly basis don't they?
>
> A:     They all assume that he's working 48 – 45 hours a week and his historical pattern was to earn at least a flag rate – as if his flag hours were higher than his regular hours.  That was the historical pattern.  So if he's required to work for 45 hours, chances are he would have produced more output than that, so that the 45 hours does seem a reasonable assumption.

(*Id.* at 7-12; Doc. 74-1 at 64.)  However, Mr. Haddock testified that those calculations are incorrect, and everything after line 41 in column W of his spreadsheet would need to be recalculated:

> Q:     Okay.  And then at line – is it 41 where we switched?
>
> A:     Thereafter it's J minus F.
>
> Q:     And J is per punch.
>
> A:     That should have been column G.
>
> Q:     And per punch is your calculation where you changed values and had things in the wrong cells, resulting in the 67-hour error?
>
> A:     Right.
>
> Q:     Okay.
>
> A:     But the formula should have been column G, not Column J.
>
> Q:     Okay. So everything in column W after line 41, which is the February 6, 2011, week ending –

1    A:    Uh-huh.

2    Q:    -- is really meaningless, correct?

3    . . .

4    THE WITNESS:    What I can say is that it can be recalculated.

5    BY MS. JAMES:    But that is the form – that is the column from which
     you are deriving the 237 hours that you're telling me now is your
6    justification for calculating projected earnings on a commission-based
     employee by taking an hour's times unit rate and multiplying it, right?
7
     . . . .
8
     THE WITNESS:    I recognize that there's an inconsistency in the
9    calculation, and I can work out what the impact is.

10   (Doc. 74-1 at 67-68.)  Mr. Haddock further testified during his deposition that he could

11   not identify, as of that time, the impact of his errors in that column on the 237 hour

12   calculation, which he used as the basis for key assumptions in his formulas (other than his

13   minimum wage formula).  Ultimately, Mr. Haddock conceded that his errors impacted his

14   conclusions as provided in his Report and Supplemental Report.  (*Id.* at 72.)

15        Mr. Haddock asserted during his deposition that he can fix his calculations.

16   However, nothing in the record indicates that Mr. Haddock has submitted a supplemental

17   report with new calculations, based on corrected data, since his deposition, and such a

18   submission now would be untimely.  In light of his admitted errors, and the impact of

19   those errors, the Court will exclude Mr. Haddock's testimony as described above.  *See*

20   *EEOC v. Freeman*, 961 F. Supp. 2d 783, 796 (D. Md. 2013), aff'd, 778 F.3d 463 (4th Cir.

21   2015) (granting the Defendant's motion to exclude expert Murphy's testimony because

22   "there appear to be such a plethora of errors and analytical fallacies underlying Murphy's

23   conclusions to render them completely unreliable").

24        Plaintiff argues that Mr. Haddock's errors "are not grounds to exclude [his

25   testimony] to the weight of the evidence, subject to cross examination and rebuttal

26   testimony before the fact finder," citing to *Alaska Rent-A-Car, Inc.*, 738 F.3d 960, 969-70

27   (9th Cir. 2013), *Quillen v. Safety-Kleen Sys., Inc.*, Civ.A.07-67-EBA, 2010 WL 8357353,

28   at *1 (E.D. Ky. May 27, 2010), and *Farragut v. Nationwide Mut. Fire Ins. Co.*,

- 18 -

1:06CV0636 LTS-JMR, 2007 WL 2956396, at *1 (S.D. Miss. Oct. 9, 2007).  (Doc. 79 at 15-16.)  The Court does not find these cases applicable here.  First, the quoted text by Plaintiff from *Alaska Rent-A-Car* is not helpful because, unlike that case, Mr. Haddock admitted that his calculations are not accurate due to his data entry errors.  Similarly, in *Quillen*, unlike the case here, the errors by the expert were "alleged" to have occurred.  Likewise, in *Farragut*, the Court held that "the experts are not disqualified because their conclusions are in conflict with the testimony of an eyewitness."  Here, there is no conflict.  Mr. Haddock's calculations are admittedly incorrect.

Plaintiff also argues that Mr. Haddock's "alleged minor errors" are not comparable to those in the cases cited by Defendant where courts have excluded expert testimony. (Doc. 79 at 17.)  The Court disagrees with Plaintiff's characterization of the errors at issue here.  First, again, Mr. Haddock's errors are not alleged, they are admitted.  Second, these errors are admittedly not minor—as Mr. Haddock testified, they impact his minimum wage and overtime calculations from May 22, 2011 through August 2011. Further, he testified that his errors regarding the flag hours assigned compared to the number of hours Plaintiff worked occurred in numerous rows of data in his supporting spreadsheet.  Importantly, Plaintiff fails in his Response to address any of Mr. Haddock's specific errors or their impact on his conclusions.

Finally, Plaintiff asserts that the proper way to handle Mr. Haddock's errors is for Defendant to question Mr. Haddock about them at trial.   (Doc. 79 at 17.)  The Court disagrees.  Mr. Haddock failed to provide Defendant with a timely supplemental report containing accurate calculations.[5]  If the Court allows Mr. Haddock to testify, he will presumably modify his spreadsheet and recalculate the minimum wage and overtime owed to Plaintiff, as well as the difference between the hours Plaintiff worked and his assigned flag hours, which may impact his analysis of Plaintiff's overtime wages owed, projected earnings, and post-termination economic loss.  It would substantially prejudice

---

[5] Mr. Haddock already issued a Supplemental Report, in part due to data entry errors, which caused him to withdraw portions his initial conclusions.  (Doc. 79-2 at 2-3; Doc. 74-1 at 30.)

Defendant to allow Mr. Haddock to effectively modify his opinions without timely providing Defendant with a supplemental report regarding those opinions before he testifies.  For these reasons, the Court will exclude Mr. Haddock's testimony regarding his opinions discussed above.

The Court will, however, allow Mr. Haddock to testify that, in his opinion, the appropriate formula for calculating any minimum wage shortfalls in this case is the effective hourly rate of pay formula he details at the bottom of Doc. 79-1, page 7 (also Bates numbered HAD00005).

Defendant argues that Mr. Haddock's formula is not an appropriate methodology for calculating the minimum wage because it includes an overtime premium.  (Doc. 74 at 12.)  Although Defendant cites to the FLSA and related regulations regarding calculating the "regular rate," Defendant does not cite to any authority that specifically prohibits Mr. Haddock's formula.  Alternative or opposing opinions or tests do not "preclude the admission of the expert's testimony—they go to the *weight*, not the admissibility." *Kennedy*, 161 F.3d at 1231.  Defendant is free to highlight any issues with Mr. Haddock's effective hourly rate of pay formula on cross-examination.[6]

### III.   Plaintiff's Motion to Strike

Plaintiff seeks to strike Defendant's filings at Docs. 86, 87, and 87-1 through 87-6, which respond to Plaintiff's objections to Defendant's Statement of Facts and present additional evidence in support of Defendant's Motion for Summary Judgment.  (Doc. 88.)  Alternatively, Plaintiff requests the opportunity to respond to the new arguments and evidence in Defendant's filings.

Rule 7.2(e)(2) of the Local Rules of Civil Procedure provides that "[u]nless otherwise permitted by the Court, a reply including its supporting memorandum may not

---

[6] As detailed above, in contrast to Mr. Haddock's opinion regarding the appropriate formula for calculating any minimum wage shortfalls, Mr. Haddock's opinions regarding the appropriate formulas for calculating overtime owed, projected earnings, and post-termination economic loss do not meet the requirements of Rule 702 because his use of those formulas all rely on the underlying assumption that Plaintiff completed work in 237 hours less than the standards—an assumption based on data entries that are admittedly incorrect.

exceed eleven (11) pages, exclusive of attachments."

Further, Rule 7.2(m) provides the following:

**(m) Motions to Strike.**

(1) Generally. Unless made at trial, a motion to strike may be filed only if it is authorized by statute or rule, such as Federal Rules of Civil Procedure 12(f), 26(g)(2) or 37(b)(2)(A)(iii), or if it seeks to strike any part of a filing or submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order.

(2) Objections to Admission of Evidence on Written Motions. An objection to (and any argument regarding) the admissibility of evidence offered in support of or opposition to a motion must be presented in the objecting party's responsive or reply memorandum and not in a separate motion to strike or other separate filing. If the underlying motion is a motion for summary judgment, an objection may be included in a party's response to another party's separate statement of material facts in lieu of (or in addition to) including it in the party's responsive memorandum, but any objection in the party's response to the separate statement of material facts must be stated summarily without argument. Any response to an objection must be included in the responding party's reply memorandum for the underlying motion and may not be presented in a separate responsive memorandum.

Here, Defendant filed three documents that all include argument in response to Plaintiff's Opposition, effectively filing an approximately 25-page reply without first seeking leave from the Court.  (Docs. 85, 86, and 87.)   Defendant concedes that its filings do not comply with the Local Rules of Civil Procedure.  (Doc. 89 at 5-6.)

However, Defendant contends that it should be allowed to submit additional evidence because the evidence is not "new," but rather "rebuttal" evidence.  Pursuant to the Local Rules of Civil Procedure, a "movant may neither attach new evidence to its reply memorandum nor file separate objections to the non-movant's controverting and additional statements of facts. Instead, the movant may use its reply memorandum to respond to the non-movant's *objections* to the movant's supporting statement of facts." *Gressett v. Central Arizona Water Conservation District*, NO. CV-12-00185-PHX-JAT, 2014 WL 4053404, at *2 (D. Ariz. Aug. 13, 2014); *see also Kinnally v. Rogers Corp.*, No. CV-06-2704-PHX-JAT, 2008 WL 5272870, at *1-2 (D. Ariz. Dec.12, 2008) (striking

the defendant's improper reply and objections because "[t]he Local Rules do not contemplate attaching additional exhibits to replies in support of summary judgments[] or filing a separate response to the non-moving party's statement of facts,". . . .'[t]his is consistent with the moving party's need to show no genuine issue of material facts exists and that there is no need for a trier of fact to weigh conflicting evidence, assuming the non-moving party's evidence is true.'").[7]   Accordingly, it would be entirely appropriate for the Court to strike Defendant's unauthorized filings.  However, as detailed below, the Court finds that even considering the additional filings, Defendant is not entitled to summary judgment on any of Plaintiff's claims.  Therefore, in its discretion, the Court will deny Plaintiff's Motion to Strike.

**IV.   Defendant's Motion for Summary Judgment**

> **a.  Summary Judgment Standard**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."

---

[7] Defendant argues that granting a motion to strike is a "drastic remedy," citing to *Woods v. The Villas at Camelback Crossing*, CV 11-2284-PHX-JAT, 2012 WL 3108820, at *2 (D. Ariz. July 31, 2012).  However, at issue in *Woods* was a motion to strike the Plaintiff's Complaint under Rule 12(f) of the Federal Rules of Civil Procedure, not a motion to strike additional filings in support of a motion for summary judgment that are, admittedly, prohibited by the Local Rules of Civil Procedure.

1     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

2          **b.  AEPA Claim**

3          Defendant claims that summary judgment in its favor on Plaintiff's AEPA claim is

4     appropriate because: (1) Defendant did not terminate Plaintiff's employment; (2) there is

5     no evidence that any decision to terminate Plaintiff's employment was caused by

6     Plaintiff's protected activity; and (3) Defendant has offered a legitimate, non-retaliatory

7     reason for terminating Plaintiff's employment (to the extent it did so), which Plaintiff

8     cannot rebut.  (Doc. 71 at 4-10.)

9          The AEPA provides the following:

10               3.  An employee has a claim against an employer for
               termination of employment only if one or more of the
11               following circumstances have occurred:

12               (c) The employer has terminated the employment relationship
               of an employee in retaliation for any of the following:
13
14               . . . .

15               (iii) The exercise of rights under the workers' compensation
               statutes prescribed in chapter 6 of this title.

16    A.R.S. § 23-1501(3)(c)(iii).  To succeed on this claim, Plaintiff must show that: (1) he

17    engaged in a protected activity; (2) he suffered an adverse employment action; and (3)

18    there is a causal link between the two. *See Hernandez v. Spacelabs Medical Inc.*, 343

19    F.3d 1107, 1113 (9th Cir. 2003); *Levine v. TERROS, Inc.*, No. CV-08-1458-PHX-MHM,

20    2010 WL 864498, at *8 (D. Ariz. March 9, 2010).  If Plaintiff provides sufficient

21    evidence to make out a *prima facie* case of retaliation, then the burden shifts to Defendant

22    to articulate some legitimate, non-retaliatory reason for its actions.  *Porter v. Cal. Dep't

23    of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005).  If Defendant sets forth such a reason, then

24    Plaintiff bears the burden of providing evidence that the reason is merely a pretext for the

25    underlying retaliatory motive.  *Id.*

26          **i.  Adverse Employment Action Taken by Employer**

27          Defendant argues that Plaintiff's AEPA claim fails as a matter of law because

28    Defendant did not terminate Plaintiff's employment.   Rather, Defendant contends,

Plaintiff abandoned his job by failing to communicate his intention to return to work within five business days of receiving the July 18, 2012 return to work letter.  (Doc. 71 at 4-8.)

The Court finds that there is a genuine issue of material fact as to whether Plaintiff suffered an adverse employment action when his employment ended on July 25, 2012. Defendant cites to evidence that Plaintiff failed to respond to attempts to reach him between July 20, 2012 and July 25, 2012.  (Doc. 72 ¶¶ 103-04.)  However, there is no dispute that Plaintiff showed up to work on May 29, 2012 in response to the May 22, 2012 return to work letter from Defendant (*Id.* ¶¶ 62, 66), he stopped by his place of employment three times in June 2012 (*Id.* ¶¶ 85-88), and he called both Ms. Diaz and Mr. St. Cyr on July 20, 2012 and left voicemails.  (*Id.* ¶¶ 103-04.)   Plaintiff's employment ended, effective July 25, 2012, even though he made phone calls to his Manager and Ms. Diaz within the five-day period of time stated in the return to work letter.  (*Id.* ¶¶ 105-06.)  In light of these facts, there is a genuine issue of material fact as to whether Plaintiff abandoned his job.

### ii.  Causation and Pretext

Defendant also argues it is entitled to summary judgment because Plaintiff cannot establish that: (1) Defendant terminated Plaintiff's employment because Plaintiff filed a worker's compensation claim; and/or (2) Defendant's proffered legitimate non-retaliatory reason for terminating Plaintiff's employment—his failure to communicate his intention to return to work within five business days of receiving Defendant's July 18, 2012 return to work letter—is pretext for retaliation.  (Doc. 71.)

To establish causation, Plaintiff must show that "engaging in the protected activity was one of the reasons for [his] firing and that but for such activity [he] would not have been fired." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (citations omitted); *see Knox v. United Rentals Highway Technologies, Inc.*, No. CV-07-297-PHX-DKD, 2009 WL 806625 at *5 (D. Ariz. March 26, 2009) (explaining that plaintiff must show employer had a "retaliatory motive [that] played a part in the

employment action") (citing *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 798 (9th Cir. 1982)). Plaintiff may succeed in establishing pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Snead v. Metropolitan Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093-1094 (9th Cir. 2001) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

The Court finds that there are genuine issues of material fact relating to causation and pretext. Defendant contends that there is no evidence of a retaliatory motive or pretext because the record demonstrates Defendant made repeated efforts to return Plaintiff to work, and Plaintiff's employment only ended when he failed to respond to attempts to communicate with him. (Doc. 71 at 8-10.) Plaintiff argues that an October 7, 2011 email from Ms. Diaz constitutes direct evidence of retaliatory animus because the email "expresses her intention to terminate Plaintiff sometime in the future when it would not appear to be motivated by his worker's compensation claim." (Doc. 82 at 5-6.)

"Direct evidence is evidence, which, if believed, proves the fact of discriminatory animus without inference or presumption." *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221–22 (9th Cir. 1998). Plaintiff misstates the text of the October 7, 2011 email—nowhere in the email does Ms. Diaz state she intends to terminate Plaintiff's employment at some future time. Rather, Ms. Diaz states that she "definitely" does not believe that Defendant could pursue termination of Plaintiff's employment at the time of the email because such action "may be perceived as an excuse to terminate due to a WC claim. Will do more harm than good." (Doc. 83-3 at 43.) Therefore, the October 7, 2011 email is not direct evidence of retaliation.

However, in addition to the email, in which Ms. Diaz evidences knowledge that the timing of terminating Plaintiff's employment could indicate a retaliatory motive, Plaintiff cites to evidence in the record of the following:

- The process Ms. Diaz followed in determining whether an accommodation was possible for an employee who had been injured at work was to review the job description, discuss the restrictions with the manager, and then allow the manager to determine if there

was a suitable position in the shop.  (Doc. 83 ¶ 128.)  In this case, Ms. Diaz was contacted by the workers' compensation carrier's assigned adjuster (Mr. Parker) on six different occasions between October 27, 2011 and March 21, 2012 regarding Plaintiff's restrictions.  However, she did not speak with Mr. St. Cyr about Plaintiff's restrictions until May 2011. (*Id.* ¶¶ 131-36.)

- Ms. Diaz responded to Mr. Parker on March 14, 2011 that Defendant could not accommodate Plaintiff. However, Ms. Diaz testified she did "nothing" to evaluate whether Defendant could accommodate Plaintiff's restrictions at that time. (*Id.* ¶ 135.)

- Ms. Diaz sent Plaintiff a return to work letter dated May 22, 2012, which was delivered on May 24, 2012, offering Plaintiff a light duty assignment.  (*Id.* ¶¶ 157, 163.)  Plaintiff called Ms. Diaz and confirmed that he would return to work on May 29, 2012.  (*Id.* ¶ 164.)  However, according to Plaintiff, when he returned to work that day, Mr. St. Cyr indicated he did not know what to do with Plaintiff, Mr. St. Cyr told Plaintiff that Plaintiff's former co-workers were no longer working there because the new people were making changes, Mr. St. Cyr made only a few efforts to contact Ms. Diaz to figure out what work Plaintiff was supposed to do, and Mr. St. Cyr said Plaintiff had too many restrictions and Mr. St. Cyr could not put Plaintiff to work.  (*Id.* ¶ 174.)  Mr. St. Cyr testified that there were duties available to accommodate Plaintiff's zero-lifting restriction. (*Id.* ¶ 138.)

- Ms. Diaz has no memory of why Plaintiff was not put back to work on May 29, 2012, and she did not investigate the matter. (*Id.* ¶ 168.) Ms. Diaz sent Plaintiff a letter on June 13, 2012, making the same offer of light duty work.  (*Id.* ¶ 180.)

- Ms. Diaz sent Plaintiff a return to work letter dated July 18, 2012, which required Plaintiff to notify Defendant within five business days to provide "if/when" he intended to return to work. (*Id.* ¶¶ 182, 184.)  Plaintiff called Ms. Diaz and Mr. St. Cyr on July 20, 2012 and left voicemails, thereby contacting Defendant within the five-day period of time detailed in the July 18, 2012 letter.  (*Id.* ¶¶ 185-86, 190.)  However, on July 26, 2012, Ms. Diaz made the decision to terminate Plaintiff's employment, effective July 25, 2012.  (Doc. 72 ¶¶ 105-06; Doc. 83 ¶ 195.)

- Mr. Parker testified that Ms. Diaz told him she spoke with Plaintiff and Plaintiff stated he would return to work on July 23, 2012, but then failed to appear for work on that date, while Ms. Diaz testified she never spoke to Plaintiff and his employment ended because he failed to return calls or show up to the shop. (Doc. 83 ¶¶ 189, 196.)

- Mr. St. Cyr testified that Plaintiff's employment would not have been terminated had he specifically stated in his July 20, 2012 voicemail that he could return to work.  (*Id.* ¶ 192.)

The Court finds that in light of the above, and Defendant's submission of evidence regarding its accommodation offers, repeated unsuccessful attempts to contact Plaintiff,

and the reason Plaintiff's employment ended, there are genuine issues of material fact relating to whether Defendant had a retaliatory motive in terminating Plaintiff's employment, and whether Defendant's proffered reason for terminating Plaintiff's employment was pretextual.   Accordingly, the Court will deny Defendant's Motion for Summary Judgment with regard to Plaintiff's AEPA claim.

### b.  Minimum Wage Claim

Defendant contends that it is entitled to summary judgment on Plaintiff's minimum wage claim because the evidence shows Defendant paid Plaintiff 1.5 times greater than the Arizona minimum wage during his employment.   (Doc. 71 at 17.) Plaintiff contends that: (1) Defendant did not ensure Plaintiff was paid at least the minimum wage for each workweek (as opposed to pay periods); (2) payment was not given until the vehicles were delivered (as opposed to when the work was completed); (3) and Defendant did not pay Plaintiff the Arizona minimum wage for three pay periods during his employment (the pay periods ending on March 20, 2011, May 22, 2011, and July 24, 2011).   In support, Plaintiff cites to the chart provided by Defendant (Bates numbered ABW 1214) that contains Plaintiff's gross earnings and total hours worked per week, and witness testimony from Defendant's 30(b)(6) representative.  (Doc. 83 at 39; Doc. 72-7 at 5, 83.)  In its Reply, Defendant does not dispute that it failed to pay Plaintiff at least the Arizona minimum wage during the three pay periods identified.  (Doc. 10 at 10-11.)  Instead, Defendant asserts, for the first time, that any shortfall is *de minimus* and that Plaintiff is not entitled to liquidated or treble damages under the FLSA and Arizona law. (*Id.*)

First, the Court need not consider arguments presented for the first time in a reply brief.  *See Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) (arguments raised for the first time in a reply brief are waived).  Further, based on the evidence cited to by Plaintiff, there is a genuine issue of material fact as to whether Defendant's internal reports determined whether Plaintiff was paid at least the minimum wage each week.  As Plaintiff notes, during the three pay periods identified, Plaintiff's gross pay divided by the

1   number of hours worked equals an hourly rate less than the Arizona minimum wage in

2   effect at the time.  (Doc. 72-7 at 83.)

3        Additionally, Defendant's "*de minimis*" argument does not establish that

4   Defendant is entitled to summary judgment.  Defendant does not cite to any authority to

5   support the contention that it can escape paying shortfalls in minimum wage payments

6   because the shortfalls are "*de minimis*."   Further, Defendant does not address any of the

7   three factors it identifies as part of the *de minimis* analysis, nor is there sufficient

8   evidence before the Court to assess these factors.  *See Rutti v. Lojack Corp.*, 596 F.3d

9   1046, 1057 (9th Cir. 2010) ("[I]n determining whether otherwise compensable time is *de*

10  *minimis*, we will consider (1) the practical administrative difficulty of recording the

11  additional time; (2) the aggregate amount of compensable time; and (3) the regularity of

12  the additional work.") (quoting *Lindow v. United States*, 738 F.2d 1057, 1063 (9th Cir.

13  1984)).  Instead, Defendant argues that the amount owed is generally *de minimis* and it

14  acted in good faith.  (Doc. 85 at 10-11.)   For these reasons, the Court will deny

15  Defendant's Motion for Summary Judgment as to Plaintiff's minimum wage claim.[8]

16       **c.  FLSA Overtime Claim**

17       Finally, Defendant seeks summary judgment on Plaintiff's overtime claim because

18  Defendant asserts Plaintiff was an exempt employee and, therefore, not entitled to

19  overtime compensation under the FLSA.   (Doc. 71 at 11-17.)   The FLSA generally

20  forbids an employer engaged in commerce from "employ[ing] any of his employees . . .

21  for a workweek longer than forty hours unless such employee receives compensation for

22  his employment in excess of the hours above specified at a rate not less than one and one-

23  half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1). However,

---

24

25  [8] Defendant also contends that "[t]o the extent Count V, which is titled 'Violation of the Arizona Minimum Wage Act,' alleges that ABW violated the separate statute

26  A.R.S. § 23-351 (the Arizona Wage Act)," that claim is time-barred.  (Doc. 71 at 10-11.) Although Plaintiff cites to A.R.S. § 23-351 in his Amended Complaint, he titles Count V

27  of his Amended Complaint as a minimum wage claim.  (Doc. 1 at 12.)  Further, Plaintiff does not claim in his Response to Defendant's Motion for Summary Judgment or other

28  briefing that he is asserting a separate wage claim under A.R.S. § 23-351.  (Doc. 82; Doc. 79 at 2.)  Therefore, the Court presumes that Plaintiff is not asserting such a wage claim in this litigation.

- 28 -

employers are not required to pay overtime (1) to an employee of a "retail or service establishment," (2) if the regular rate of pay of the employee "is in excess of one and one-half times the minimum hourly rate," and (3) if "more than half his compensation for a representative period (not less than one month) represents commissions on goods or services." *Id.* at § 207(i). An employee's regular rate of pay is "'the hourly rate actually paid the employee for the normal, nonovertime workweek for which he is employed' and 'by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments.'" 29 C.F.R. § 779.419 (quoting *Walling v. Youngerman–Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945)). An employer claiming an exemption under the FLSA has the burden of demonstrating that it applies. *Donovan v. Nekton, Inc.*, 703 F.2d 1148, 1151 (9th Cir. 1983).

Plaintiff does not dispute that Defendant is a retail or service establishment. Rather, Plaintiff argues that he was not paid at least 1.5 times the applicable minimum wage, and Plaintiff was not paid based on a valid commission system. (Doc. 82 at 15-19.) The Court will deny Defendant's request for summary judgment on Plaintiff's FLSA claim. As detailed above, although Defendant asserts in its Motion for Summary Judgment that its internal reports "confirm[ed] that Plaintiff earned at least 1.5 times the Arizona minimum wage from January 2011 through September 2011," Defendant does not dispute Plaintiff's contention that he was not paid minimum wage (let alone 1.5 times the minimum wage) during at least three pay periods during Plaintiff's employment. (Doc. 85 at 10-11.) Accordingly, based on the evidence in the record, Defendant has failed to demonstrate that it is entitled to judgment as a matter of law on Plaintiff's FLSA claim.[9] Because the Court finds there are fact issues as to whether Defendant's internal

---

[9] The Court does not find Defendant's argument regarding Plaintiff's failure to properly plead its FLSA claim persuasive. Defendant did not file a motion to dismiss or motion for judgment on the pleadings asserting such arguments, and fails to provide any justification for not doing so. Further, the Court finds that Plaintiff sufficiently pled his FLSA claim. (*See* Doc. 1); *Landers v. Quality Communs., Inc.*, 771 F.3d 638, 644 (9th Cir. 2014), as amended Jan. 26, 2015 ("detailed factual allegations regarding the number of overtime hours worked are not required to state a plausible claim").

reports ensured that Plaintiff was paid a regular rate of 1.5 times the minimum wage, the Court need not address the parties' other arguments regarding whether Defendant's flag rate system qualifies as a valid commission payment scheme under the FLSA.

Accordingly,

**IT IS ORDERED** that Defendant's Motion to Exclude Plaintiff's Expert Brian H. Kleiner (Doc. 73) is granted.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Plaintiff's Expert Colin Haddock (Doc. 74) is granted in part and denied in part. The Court will allow Mr. Haddock to testify that, in his opinion, the appropriate formula for calculating any minimum wage shortfalls in this case is the effective hourly rate of pay formula he details at the bottom of Doc. 79-1, page 7 (also Bates numbered HAD00005). The Court will exclude the remainder of Mr. Haddock's testimony.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike (Doc. 88) is denied.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 71) is denied. The Court will set a Final Pretrial Conference by separate order.

Dated this 8th day of March, 2016.

Honorable John Z. Boyle
United States Magistrate Judge